UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 10-CR-0031 (PJS/AJB) |
| Plaintiff, | |
| v. | ORDER |
| ARTURO BARRILLA GARCIA(1) and<br>EDVIN EMANUEL GOMEZ<br>MALDONADO (2), | |
| Defendants. | |

Thomas M. Hollenhorst, UNITED STATES ATTORNEY'S OFFICE, for plaintiff.

John L. Fossum, FOSSUM LAW OFFICE, LLC, for defendant Arturo Garcia.

Stephen W. Walburg, JASPERS MORIARTY & WALBURG, PA, for defendant Edvin Maldonado.

On May 19, 2010, a jury convicted defendants Arturo Garcia and Edvin Maldonado of one count of conspiracy to distribute methamphetamine. The jury also convicted Garcia of three counts of distribution of methamphetamine and Maldonado of two counts of distribution of methamphetamine. Docket Nos. 113, 114. This matter is before the Court on Garcia's motions for acquittal and for a new trial and on Maldonado's motions for acquittal, a new trial, and a mistrial. For the reasons stated below, the motions are denied.

*A. Background*

Most of the evidence that the government presented at trial concerned events that occurred on three particular days in late 2009: November 24, December 2, and December 10. The Court describes the evidence with respect to each of these days in turn.

1. November 24

On November 24, Francisco Morales, a confidential informant who was working with the Minneapolis Police Department, offered to set up a meeting with a man he knew by the name of "Arturo." TT 13.[1]  Morales called "Arturo," and the two agreed to meet at a Popeye's restaurant in south Minneapolis.  TT 13-14.  "Arturo" arrived at the meeting place in a 1999 Dodge Dakota truck.  TT 14.  Morales wore a recording device, which recorded his and "Arturo's" conversation.  TT 18-19.  The conversation was in Spanish.  TT 20-21.  After reviewing a translation of the recording, Officer Bart Hauge of the Minneapolis Police Department, who was working with Morales and is familiar with him from previous encounters, testified that Morales and "Arturo" were discussing drug suppliers, the purity and cost of various drugs, and prices for an upcoming drug deal.  TT 25-29.  "Arturo" gave Morales a sample of a substance that later field-tested positive for methamphetamine.  TT 28-29.  After "Arturo" left, police followed the Dakota to an apartment building at 4001 Clinton Avenue, which is where both Garcia and Maldonado lived.  TT 29, 113-14, 351, 364-65.

Hauge, who was conducting surveillance of the meeting at Popeye's, did not personally see "Arturo" at the meeting.  TT 17-18.  But two other officers who were surveilling the meeting were able to identify Garcia as the man who met Morales:  Sergeant Grant Snyder testified that he got a good look at the man through binoculars and made an in-court identification of Garcia as the man that he saw.  TT 144-45.  Similarly, Sergeant Matthew Wente took a photograph of the

---

[1]"TT" refers to the trial transcripts of witness testimony, which are consecutively paginated.  *See* Docket Nos. 140, 141.

man who was meeting with Morales and made an in-court identification of Garcia as the man in the photograph. TT 109-11.

### 2. December 2

On December 2, Hauge had Morales set up a drug buy with "Arturo." TT 35. "Arturo" told Morales to meet him at 4001 Clinton Avenue. TT 36. Snyder, who was using binoculars to surveil the scene, saw "Arturo" come out of the apartment building at 4001 Clinton Avenue, get in Morales's car, and then get out again after a couple of minutes. TT 147, 152. Snyder recognized "Arturo" as the man who met with Morales on November 24 and made an in-court identification of Garcia as the man who met with Morales on December 2. TT 152-53. After the meeting, Morales gave Hauge a package that was later tested and found to contain 25.3 grams of actual methamphetamine. TT 38-39, 64-69; Gov't Ex. 1.

Shortly after "Arturo" got out of Morales's car, officers saw the Dakota drive away from 4001 Clinton Avenue. TT 153. The Dakota drove to a restaurant in St. Paul. TT 41. A Ford pickup truck, which was later found to be associated with a man named Manuel Mata Rodriguez, TT 124, 256-57, was also at the restaurant, TT 41-42. The occupants of the Dakota and the Ford pickup interacted with each other in such a way as to arouse police suspicion.[2] TT 42, TT 124-25. Officers attempted to follow the Ford pickup as it sped out of the parking lot, but it was never stopped. TT 125-26, 137.

### 3. December 10

On December 10, an unrelated investigation involving Rodriguez was taking place. Special Agent Christopher Hage of the Drug Enforcement Administration, who is familiar with

---

[2] The testimony is vague on this point.

Rodriguez but not with Garcia or Maldonado, was working with a confidential informant named Eduardo Urbina. TT 167, 212. At Hage's request, Urbina contacted Rodriguez and arranged to buy three ounces of methamphetamine. TT 171-72. Urbina and Rodriguez agreed to meet at a Taco Bell in West St. Paul. TT 172. After arriving at the Taco Bell, Urbina saw Rodriguez pull into the parking lot. TT 321. Rodriguez was driving a Ford pickup. TT 256-57. Before making contact with Urbina, Rodriguez approached the passenger side of a Dodge Dakota that was also in the parking lot. TT 321. An occupant in the Dakota handed a package to Rodriguez, who put the package in his pocket. TT 324, 326. Rodriguez then sold the package to Urbina. TT 327. The contents of the package were later tested and found to contain 34.2 grams of actual methamphetamine. TT 79-86,178; Gov't Ex. 3. Officer Kenneth Sass, who was conducting surveillance of the buy, saw the occupants of the Dakota get out of the truck at one point and stand around looking under the hood. TT 261. Sass made an in-court identification of Garcia and Maldonado as the men in the Dakota. TT 254; *see also* TT 261-62.

Hage decided to set up a second buy on December 10. He asked Urbina to arrange the purchase of an ounce of methamphetamine from Rodriguez. TT 198-99. Rodriguez agreed to meet Urbina in a K-Mart parking lot in West St. Paul. TT 199. Once again, the Dakota was present for the transaction. TT 268-69. Rodriguez got another package from the occupants of the Dakota and sold the package to Urbina. TT 330-31. The contents of the package were later tested and found to contain 9.6 grams of actual methamphetamine. TT 88-89, 200; Gov't Ex. 4. After the second buy, law-enforcement officers followed the Dakota when it left the K-Mart parking lot. TT 274. After about a half an hour, officers stopped the Dakota and identified three

occupants: Garcia, Maldonado, and an individual named Juan Sandivol. TT 274, 276, 351, 362, 365.

### 4. Telephone Records

In addition to witness testimony about the events in late November and early December, the government also offered Rodriguez's cell-phone records for that period. TT 205. These records reveal that, in the one-month period between November 27 and December 22, there were 279 calls between Rodriguez's cell phone and a phone number associated with Maldonado. TT 207 (279 contacts between Rodriguez's number and a '5550 number); TT 365 (linking the '5550 number to Maldonado). On December 2, the day of the transaction between Morales and Garcia at 4001 Clinton Avenue, there were 25 calls between those numbers during the afternoon and evening. TT 208. On December 10, the day of the transactions between Urbina and Rodriguez, there were likewise 25 calls between those numbers. TT 208. The phone records demonstrate that, each time that Urbina called Rodriguez to arrange a purchase on December 10, Rodriguez immediately called Maldonado's number. TT 209. Hage testified that, after a drug supplier gets a call from a buyer, the next person that the supplier calls is likely to be involved in the conspiracy. TT 209-10. Maldonado and Garcia were arrested on December 22, after which there were no more phone calls between Rodriguez's number and Maldonado's number. TT 239, 249-50.

### B. *Standard of Review*

#### 1. Motion for Acquittal

Under Fed. R. Crim. P. 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In

considering a Rule 29 motion for acquittal, the court must view the evidence in the light most favorable to the government, resolve all evidentiary conflicts in the government's favor, and accept all reasonable inferences drawn from the evidence that support the jury's verdict. *United States v. Cook*, 603 F.3d 434, 437 (8th Cir. 2010). The motion should be granted only if no reasonable jury could have found the defendant guilty. *Id.*

2. Motion for New Trial

Under Fed. R. Crim. P. 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." "In ruling on a motion for a new trial, a district court need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and evaluate for itself the credibility of the witnesses." *United States v. Collier*, 527 F.3d 695, 701 (8th Cir. 2008). But a motion for a new trial should be granted only where "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred . . . ." *Id.* (citation and quotations omitted). The court's authority to grant a new trial on the basis that the verdict is against the weight of the evidence must be "exercised sparingly and with caution." *Id.*

C. *Garcia's Motions*

1. Timeliness

Under Fed. R. Crim. P. 29(c), a defendant must file a motion for acquittal, or renew such a motion, within 14 days after a guilty verdict, or within 14 days after the court discharges the jury, whichever is later. Similarly, under Fed. R. Crim. P. 33(b)(2), any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict.

Although Garcia filed a motion for a new trial within 14 days after the May 19 verdict, Garcia did not file a motion for acquittal until August 26, long after the jury returned its verdict and was discharged by the Court. *See* Docket No. 153. In a memorandum accompanying his motion for acquittal, Garcia also includes new grounds for his earlier motion for a new trial. *See* Docket No. 154. The government has not objected to Garcia's motion for acquittal as untimely, however, nor has it objected to the new grounds that Garcia has raised in support of his motion for a new trial. The Court will therefore consider these motions on the merits. *See Eberhart v. United States*, 546 U.S. 12, 18-19 (2005) (per curiam) (holding that the time limits in Rule 33 are not jurisdictional and noting that "our holding in *Carlisle* [*v. United States*, 517 U.S. 416 (1996)] did not characterize Rule 29 as jurisdictional." (citation, brackets, and quotations omitted)).

## 2. Officer Hauge's Testimony

Garcia first argues that Hauge's testimony improperly tainted the jury by leaving the jury with the false impression that Hauge had seen Garcia during the November 24 meeting with Morales. But, as noted, Hauge testified that he did not actually see Garcia at the scene, TT 17-18, and on cross examination Garcia underscored Hauge's inability to see Garcia during the meeting, TT 45-46. The jury was not improperly tainted by Hauge's identification testimony.

In addition, two other witnesses identified Garcia as the man who met with Morales on November 24. Thus, even if the jury was somehow tainted by Hauge's testimony, this is not a case in which "the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred . . . ." *Collier*, 527 F.3d at 701 (citation and quotations omitted).

Garcia also argues that Hauge improperly testified as an expert about the meaning of Garcia's and Morales's conversation despite the fact that Hauge knows little Spanish. But the government established that Hauge was qualified, through experience and training, as an expert in the illegal drug trade. TT 4-5. The government also offered the testimony of the translator to establish the accuracy of the translation, TT 55-62, and Garcia does not contend that the translation was inaccurate in any way. Hauge's testimony about the meaning of the translated conversation was therefore proper. *United States v. Chavez-Alvarez*, 594 F.3d 1062, 1069 (8th Cir. 2010) ("The decision to permit the use of transcripts is committed to the district court's discretion, and it is well settled that juries may use translated transcripts of recorded conversations during trial and deliberations."); *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996) ("It is well established that experts may help the jury with the meaning of jargon and codewords.").

### 3. Sergeant Wente's Testimony

Garcia next argues that Wente's testimony improperly tainted the jury by suggesting that Wente saw Garcia at the November 24 meeting even though Wente did not know Garcia's name. But the government pointed out that Wente did not know Garcia by name, TT 113, and Wente testified that he photographed the meeting and that he recognized Garcia as the man in the photograph, TT 109-11. Wente's testimony was not improper.

### 4. Failure to Call Confidential Informant

Garcia complains that the government and government witnesses extensively discussed Morales even though Morales was not called to testify. Garcia implies that there was something improper about this, although he does not explain exactly what was improper. In any event, the

Court can discern no prejudice to Garcia. The government did not represent to the jury that Morales would testify and there is no dispute that Garcia knew Morales's identity and could have called him to testify if he so desired. *Cf. United States v. Perry*, 925 F.2d 1077, 1081 (8th Cir. 1991) (affirming denial of motion for mistrial where prosecutor's opening statement referred to witness who then failed to appear).

5. Insufficient Evidence of Involvement in December 2 Transaction

Garcia argues that none of the government's witnesses was able to identify the person who met with Morales during the December 2 drug buy. Garcia is incorrect. Snyder saw Garcia at the December 2 drug buy and recognized him from the November 24 meeting with Morales. Although Snyder did not know Garcia's name, he was able to make an in-court identification of Garcia as the man whom he saw on both occasions. TT 145, 153. Moreover, substantial circumstantial evidence supports Snyder's identification: the "Arturo" that Morales met on November 24, and that both Snyder and Wente identified as Garcia, afterwards drove a Dodge Dakota to 4001 Clinton Avenue, which is where Garcia lived. This same "Arturo" arranged to meet Morales at 4001 Clinton Avenue on December 2, after which the Dakota was seen driving away. On December 10, Garcia was driving the Dakota when he was stopped by law enforcement. There was ample evidence from which the jury could find that Garcia sold methamphetamine to Morales on December 2.

6. Insufficient Evidence of Involvement in December 10 Transaction

Garcia also argues that the evidence was insufficient for the jury to find that he was anything more than present at the scene on December 10. But given the direct evidence of Garcia's involvement in selling or supplying drugs on other occasions, the evidence that Garcia

was present in the Dakota at both of the December 10 transactions, and the evidence that Rodriguez obtained the drugs from someone in the Dakota during both transactions, a jury could reasonably infer that Garcia was involved in the sale of drugs on December 10.

### 7. Defendants' Custodial Status

Finally, Garcia moves for a new trial on the basis that, during the trial, the jury became aware of his and Maldonado's custodial status. The circumstances underlying Garcia's motion are as follows: Two of the jurors had relatives who drove them to and from the courthouse each day and who stayed to observe the trial. TT 189-90, 191-92. On being informed that defense counsel were concerned about the possibility of jury contamination, the Court questioned the two jurors — individually, and outside the presence of any other juror — to determine whether they discussed the trial with these relatives. TT 189-93. One of the jurors stated that her relative had told her that Garcia and Maldonado were led into and out of the courtroom by the two gentlemen sitting in the front of the courtroom. TT 190. But the juror adamantly denied sharing this or any other information with anyone else on the jury, TT 190-91, and the Court found her denial credible. The Court cautioned the juror not to share the information with anyone on the jury and then excused the juror from further service. TT 191, 194. The other juror stated that she and her relative had been careful not to discuss anything about the trial. TT 192-93. The Court found her assertion credible. After reinforcing that the juror should not discuss any aspect of the trial with her relative, TT 193, the Court permitted her to remain on the jury.

Garcia moves for a new trial on the basis that the jury knew about his and Maldonado's custodial status. But, as discussed above, only one juror received information about defendants' custodial status. That juror credibly denied sharing this information with anyone else on the jury,

and the Court excused that juror from further service. There is thus no basis to conclude that the jury was tainted by information about defendants' custodial status. Garcia's motions for a new trial and for acquittal are therefore denied.

*D. Maldonado's Motions*

1. Insufficient Evidence of Participation in December 2 Transaction

Maldonado moves for a judgment of acquittal on the jury's finding that he conspired to distribute 50 or more grams of methamphetamine. The jury could only have found this amount, Maldonado argues, if it found that he was guilty as a co-conspirator in the December 2 drug buy. Maldonado contends that there is no evidence that he knew of or had any involvement in that drug buy. The Court disagrees.

Although there may not be direct evidence of Maldonado's involvement in the December 2 drug buy, there is strong evidence, both direct and circumstantial, that Maldonado was involved in a methamphetamine conspiracy with Garcia and Rodriguez during late November and early December 2009. There is, as noted, direct evidence linking Garcia to the December 2 drug buy. There is also circumstantial evidence connecting Rodriguez with the December 2 drug buy, given that, after the buy, the Dakota was driven from 4001 Clinton Avenue (where Maldonado lived) to a location where Rodriguez's truck was seen. More damning still, there were 25 phone calls between Rodriguez's phone and Maldonado's phone on that day. A rational jury could find that Maldonado was a part of a conspiracy that included the December 2 drug buy.

### 2. Improper Joinder

Maldonado moves for a new trial on the basis that he was improperly joined as a defendant. Maldonado offers no new argument or reasoning to support this contention, which the Court has already rejected. *See* Docket No. 69 at 2-3.

### 3. Denial of Motion to Continue

The government produced a lab report, dated April 26, 2010, containing the results of testing performed on the drugs involved in the December 2 buy. On the Friday before the trial was scheduled to begin, Maldonado filed a motion for a continuance, arguing that he needed time to obtain his own analysis of the drugs. Docket No. 101. The Court denied Maldonado's motion in part because Maldonado had waited until the last minute to seek a continuance despite the fact that he'd had the government's test results for nearly three weeks. Maldonado now moves for a new trial on the basis that the Court erred in denying his motion.

The Court disagrees. Maldonado has given no reason justifying his decision to wait until one business day before the trial was scheduled to start to move for a continuance. And even if the Court erred in denying Maldonado's motion for a continuance, that error was harmless. The original test found the drugs to be 97 percent pure. TT 69. At Garcia's request, the drugs were retested after trial and found to be 98.1 percent pure. Gov't Attach. 1 [Docket No. 160-1]; *see also* Docket Nos. 119, 120, 132, 135 (requests from both defense counsel for extensions of time to file post-trial briefs in anticipation of the retest). Maldonado thus cannot show any prejudice from the Court's denial of his motion for a continuance.

### 4. Maldonado's Custodial Status

Finally, Maldonado moves for a mistrial on the basis that the jury was tainted by knowledge that he and Garcia were in custody. As explained above, this contention is baseless. The only juror who had knowledge of defendants' custodial status was excused by the Court, and she credibly assured the Court that she had not discussed the fact of defendants' custodial status with any other juror. Maldonado's motion for a mistrial is denied.

### ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendant Arturo Barrilla Garcia's motion for a new trial [Docket No. 117] is DENIED.

2. Defendant Arturo Barrilla Garcia's motion for acquittal [Docket No. 153] is DENIED.

3. Defendant Edvin Emanuel Gomez Maldonado's motion for acquittal, for a new trial, or for a mistrial [Docket No. 115] is DENIED.

Dated: October 8, 2010

s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge